# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

**TAWANA DAWSON,**

   **Plaintiff,**

**vs.**                                          **Case No.  3:23cv7897-CAS**

**MARTIN J. O'MALLEY,**
**Commissioner, Social Security**
**Administration,[1]**

   **Defendant.**

_____/

## MEMORANDUM OPINION AND ORDER

This is a Social Security case referred to the undersigned magistrate judge upon consent of the parties.  ECF No. 17.  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) pursuant to Title II of the Social Security Act (Act) and application for Supplemental Security Income (SSI) pursuant to Title XVI of

---

[1]  Kilolo Kijakazi was the Acting Commissioner of Social Security at the time of the ALJ's decision here but was replaced by Commissioner O'Malley on December 20, 2023.

the Act.  After consideration of the entire record, the decision of the

Commissioner is **REVERSED** and **REMANDED** for further proceedings.

## I.  Procedural History

On October 1, 2020, Plaintiff, Tawana Dawson, filed applications for a

period of disability and DIB and SSI and alleged disability beginning

November 20, 2019, revised to November 23, 2019, "which is the day after

a prior final adverse decision issued by Administrative Law Judge [ALJ]

Kevin Boucher," Tr. 58, 89-112.[2]  Tr. 294-302.  The later "unfavorable

decision was upheld by the Social Security Appeals Council on July 22,

2020."  Tr. 10-11 (citation omitted).  Plaintiff's alleged disability is based, in

part, on chronic migraines, chronic back pain, ADHD, bipolar disorder, and

depression.  Tr. 324.  The ALJ identified several "severe medical

impairments" in the decision.  Tr. 13, 61-63.

The application was initially denied on May 6, 2021, and upon

reconsideration on October 18, 2021.  Tr. 10, 120-97, 227, 232, 237, 240.

On June 28, 2022, ALJ Roger A. Nelson held a telephone hearing due to

the extraordinary circumstance presented by the COVID-19 pandemic.

---

[2]  Citations to the record (transcript/administrative record), ECF No. 8, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

Tr. 10, 52-88.  Plaintiff testified.  Tr. 63-83.  Pamela J. Nelligan, MS, CRC, an impartial vocational expert (VE), testified.  Tr. 10, 83-87, 367-68 (Resume).  John M. Pennington, an attorney, represented Plaintiff at the hearing. Tr. 10, 52, 202, 373.

On August 15, 2022, the ALJ entered a decision and denied Plaintiff's application for disability through the date of the decision.[3]  Tr. 32-33.

Thereafter, Plaintiff requested the Appeals Council to review the ALJ's decision; the Appeals Council denied Plaintiff's request for review on March 27, 2023.  Tr. 1-5, 287-89, 374-75.  The ALJ's decision stands as the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

On April 10, 2023, Plaintiff filed a Complaint with this Court seeking review of the ALJ's decision.  ECF No. 1.  The parties consented to have a United States Magistrate Judge conduct all proceedings, ECF Nos. 9-10, and the case was transferred to the undersigned for consideration.  ECF No. 16.  The parties filed memoranda of law, ECF Nos. 14-15, which have been considered.

---

[3]  On May 16, 2018, Plaintiff filed DIB and SSI applications alleging disability beginning March 12, 2018.  Tr. 92.  ALJ Kevin Boucher determined Plaintiff had several severe impairments but not migraine headaches as alleged in this case, although Plaintiff alleged "**dizziness** and vertigo" and "migraines," which were considered but not found to be severe impairments.  Tr. 94-96 (emphasis in original).  On November 22, 2019, the ALJ determined Plaintiff was not disabled through the date of the decision. Tr. 106-07.  On July 22, 2020, the Appeals Council denied review.  Tr. 113-16.  No appeal was taken of this decision.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this

appeal:

1. "The claimant will continue meeting the disability insured status coverage requirements under Title II of the Social Security Act through September 30, 2023."  Tr. 13.

2. "The claimant has not engaged in any established substantial gainful work activity since November 23, 2019, her amended disability onset date."  *Id*.

3. "The claimant possesses the following combination of severe medical impairments: a bipolar disorder; an anxiety-related disorder; *migraine headaches*; post-traumatic degenerative osteoarthritis of the right foot; an attention deficit disorder; degenerative disc disease and degenerative osteoarthritis of the cervical spine at the C-3 to the C6 levels; degenerative osteoarthritis of the lumbar facet joints from L3 to S1; hypertension, and obesity."  *Id*.  (emphasis added).  The ALJ determined that these impairments "significantly limit the claimant's ability to perform some basic work-related activities as described in SSR 85-28; but they do not prevent her from performing all work in the national economy."  Tr. 13.  The ALJ also noted that Plaintiff "has received treatment for a variety of gynecological, gastrointestinal, and urological conditions during the relevant period…, but these are not severe impairments."  *Id*.; *see also* Tr. 14.

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."[4]  Tr. 14.  As discussed in more detail hereafter, the ALJ noted

---

[4] The ALJ is not required to identify all impairments that should be considered severe.  *See Heatly v. Comm'r of Soc. Sec.,* 382 F. App'x 823, 825 (11th Cir. 2010) (unpublished); *see also Mariarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987).  Plaintiff does not claim the ALJ omitted a severe impairment.  ECF No. 14.

that "there is no listing pertaining to migraine headaches" but "considered this condition in conjunction with the requirements of the subsections of section 11.00 of the Medical Listings pertaining to neurological disorders.  In particular, the [ALJ] has considered [ ] subsection pertaining to seizure disorders."  Tr. 15.  The ALJ also considered other alleged impairments under several other medical listings including Plaintiff's alleged mental impairments and found them not to be severe.  Tr. 16-18.  Regarding the latter, the ALJ determined that Plaintiff had *mild* limitation in understanding, remembering or applying information and *moderate* limitations in interacting with others, concentrating, persisting or maintaining pace, and adapting or managing herself.  Tr. 16-17.  The ALJ determined that Plaintiff's "mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation under the 'paragraph B' criteria and further that the 'paragraph C' criteria were not met.

> The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life.  There is no evidence that the claimant has experienced an extended episode of decompensation since the alleged onset date, that a minimal increase in mental demands or change in the environment would cause her to decompensate, or that the claimant is unable to function outside of a highly supportive living arrangement due to her mental impairments.

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental

> functioning.  The following residual functional capacity
> assessment reflects the degree of
> limitation the undersigned has found in the "paragraph B"
> mental function analysis.

Tr. 17-18.  Plaintiff does not question the ALJ's consideration of the

severity of Plaintiff's mental inpairments.  ECF No. 14.

5.  "[T]he claimant still has the residual functional capacity [RFC] to
perform many elements of a light level of work as defined in 20
CFR 404.1567(b) and 416.967(b), even though she cannot
perform a "full range" of such work.  For instance, the claimant can
perform lifting and carrying of between 10 pounds frequently and
20 pounds occasionally.  The claimant must avoid all crawling or
climbing up and down any ladders, ropes or scaffolds.  The
claimant must avoid being around all unprotected heights,
dangerous moving machinery, excessive vibration when using the
hands (e.g. the use of power tools), or the operation of any
motorized machinery.  The claimant can perform no more than
occasional amounts of bending, stooping, kneeling, crouching, or
squatting when on the job.  The claimant can no more than
occasionally use stairs and/or ramps.  The claimant can sit for 1
hour at a time for up to 6 hours per day.  The claimant can stand
and/or walk for 30 to 45 minutes at a time for up to 4 to 4.5 hours
per standard workday.  The claimant is further limited to the
performance of only routine and repetitive unskilled work tasks or
assignments of a lower stress nature (e.g. no more than
occasional changes in her routine unskilled work setting, no more
than occasional decision making when on the job, and no more
than occasional interaction with supervisors and members of the
general public."  Tr. 18; *see also* Tr. 83-85 (hypotheticals posed to
the vocational expert (VE)).[5]  The RFC is in large measure
consistent with the hypotheticals posed to the VE.  *Id*.

---

[5]  "Occasionally" means "activity or condition exists up to 1/3 of the time."
*Dictionary of Occupational Titles* (DOT) (4th ed., rev. 1991), Appendix C: Components
of the Definition Trailer, § IV Physical Demands-Strength Rating.  "Frequently" means
"activity or condition exists from 1/3 to 2/3 of the time."  *Id*.

6. "The claimant is unable to perform past relevant work" as a Nursing Assistant/Home Health Aide, medium exertion but very heavy as performed; SVP 4; and semi-skilled. Tr. 30-31, 85.  The ALJ noted that the vocational expert testified a person with the claimant's limitations outlined above in paragraph 5 would "preclude such hypothetical individual from performing the claimant's past relevant work."  Tr. 31, 85.

7. The claimant was born in 1983 and "was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date."  The claimant "is currently 38 years old."  Tr. 31.  Plaintiff has at least a high school education.  *Id*.  Transferability of jobs is not material in this case.  *Id*.

8. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform" such as Office Helper, Sorter, and Non-Postal Mail Clerk, all unskilled (SVP 2) and light exertion.[6]  Tr. 32, 85-86.  The VE testified, that in response to the ALJ's hypothetical RFC formulation, she had to significantly move out of the realm of the DOT work descriptions because "[t]he DOT does not directly address the issue regarding the standing and walking for only four hours a day" so the VE addressed the availability of potential jobs based on her "professional experience and training, and also, [her] experience [in] placing people into jobs, and observation of jobs."  The VE also offered "a need to sit after standing 30 to 45 minutes or the need to have to stand after sitting."  Tr. 86.  The ALJ followed up with the following questions and received the following responses.

---

[6] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  A Specific Vocational Preparation (SVP) of 2 means "[a]nything beyond short demonstration up to and including one month."  *Dictionary of Occupational Titles* (DOT) (4th ed., rev. 1981), App. C: Components of the Definition Trailer, § II, SVP.  "[SVP] it is defined as the amount of elapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id*.  Unskilled work corresponds to an SVP of 1 and 2.  SSR  00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  *See Buckwalter v. Comm'r of Soc. Sec.*, 5 F.4th 1315 (11th Cir. 2021) (discussing SVP Levels 1 and 2).  Light work involves, in part, "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

Q Okay.  In the alternative, let's assume the individual when trying to carry out these duties is going to have recurrent symptomatic flares from either migraine headaches, pain in the back, or other related symptoms, whether physical or mental in nature, and they're going to be left with difficulty sustaining work attendance to the extent that they're to either have to piecemeal their attendance, by calling in or reporting to work late on occasion, leaving or asking permission to leave work early on occasion, and or taking a sick day, here or there, and the total impact that on a cumulative basis is going to lead to 25 to 30 hours missed per four week work month, in your opinion is that consistent with the ability to function in any of the jobs you cited or any other work that you could identify out there in the national economy.

A Given that hypothetical, the individual would not be capable of maintaining any type of competitive work activity in the national economy.

Q And in your opinion, what is the absenteeism rate that's acceptable to entry level unskilled work?

A Typically, employers would not allow the individual to miss more than one day per month in a given year.

Tr. 86-87.

9. "The claimant has not been under a disability, as defined in the Social Security Act, from November 23, 2019, through the date of this decision," August 15, 2022.  Tr. 32-33.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986); *see also Biestek v. Berryhill*, __U.S.__, 139 S. Ct. 1148,

1154, 203 L. Ed. 2d 504 (2019) (Substantial evidence "means-and means only-such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (citations and internal quotation marks omitted)).  "Substantial evidence is more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam).  "The Commissioner's factual findings are conclusive if supported by substantial evidence." *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[7]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" *Bloodsworth*, 703 F.2d at 1240 (citations omitted).  A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but

---

[7]  Stated otherwise, this Court may not reweigh the evidence or substitute its own judgment for that of the Commissioner.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  *Id.*; *see also Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1314 (11th Cir. 2021).

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[8]  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  *Barnhart v. Walton*, 535 U.S. 212, 224 (2002).  In addition, an individual is entitled to DIB if he or she is under a disability prior to the expiration of his or her insured status.  *See* 42 U.S.C. § 423(a)(1)(A); *Moore v. Barnhart*, 405 F.3d at 1211; *Torres v. Sec'y of Health & Human Servs.*, 845 F.2d 1136, 1137-38 (1st Cir. 1988); *Cruz Rivera v. Sec'y of Health & Human Servs.*, 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity [SGA]?

---

[8]  The relevant DIB and SSI regulations are "essentially the same."  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986).  As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless an SSI regulation provides otherwise.  The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal the criteria listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[9]

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding

---

[9] An RFC is the most a claimant can still do despite limitations. 20 C.F.R. § 404.1545(a)(1). It is an assessment based upon *all* of the relevant evidence including the claimant's description of limitations, observations by treating and examining physicians or other persons, and medical records. *Id.*; *see* SSR 96-8p (July 2, 1996); *see also Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1268 (11th Cir. 2019) (per curiam) ("Consideration of all impairments, severe and non-severe, is required when assessing a claimant's RFC."). The responsibility for determining a claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c); *see Cooper v. Astrue*, 373 F. App'x 961, 962 (11th Cir. 2010) (unpublished) (explaining claimant's RFC determination "is within the province of the ALJ, not a doctor"). Relevant medical and other evidence includes, among other things, medical history, medical signs, and laboratory findings, (*i.e.* side effects of medication), daily activities, lay evidence, recorded observations, and ethical source statements. SSR 96-8p (July 2, 1996).

that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  *Phillips*, 357 F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Chester*, 792 F.2d at 131; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

A claimant bears the burden of proving he or she is disabled and is responsible for producing evidence in support of the claim.  *See* 20 C.F.R. § 404.1512(a); *Moore*, 405 F.3d at 1211.

An ALJ was required to weigh a medical opinion under prior regulations applicable to claims filed before March 27, 2017.  *See* 20 C.F.R. § 404.1520c, abrogating the "'treating-physician rule.'"  *Harner v. Soc. Sec. Admin., Comm'r,* 38 F.4th 892, 896 (11th Cir. 2022).  However, the regulations applicable to this case remove the treating source rule and state an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s).  *See* 20 C.F.R.

§ 404.1520c(a).

Stated otherwise, "ALJs are no longer required to give controlling weight to a treating physician's opinion, as was mandated by federal regulations and our prior caselaw in the past." *Webster v. Kijakazi*, 19 F.4th 715, 718-19 (5th Cir 2021) (citing "82 Fed. Reg. 5853 (Jan. 18, 2017) (commenting that the rule change would enable courts to focus on 'the content of the evidence [rather] than on the source.'")).

The relatively new regulations control consideration of the proper weight given to medical opinions. *See* 20 C.F.R. § 404.1520c(a)-(c); *see also* 20 C.F.R. § 404.1513(a)(2) (defining medical opinion). The regulations contain a source-level articulation requirement, *i.e.,* the ALJ considers multiple medical opinions from a source in a single analysis. 20 C.F.R. § 404.1520c(b)(1). The ALJ is not required to address every limitation identified by a medical source. *Id.*

Under the regulations applicable to this case, an ALJ must consider and assess medical opinions based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) the specialization of the medical source; and (5) other factors that tend to support or contradict a medical opinion, including the source's familiarity with other evidence in the claim, or understanding of SSA policies and

evidentiary requirements.  20 C.F.R. § 404.1520c(c)(1)-(5).  "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)."  20 C.F.R. § 404.1520c(a); *see also Webster v. Kijakazi*, *supra*.  "Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision."  20 C.F.R. § 404.1520c(b)(2).

Regarding "supportability," "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).  Regarding "consistency," "[t]he more consistent a prior medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."

20 C.F.R. § 404.1520c(c)(2).  "A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder."  20 C.F.R. § 404.1520c(c)(3)(v).  "When we consider the medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." 20 C.F.R. § 404.1520c(c)(5).  "[ALJs] are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate." 20 C.F.R. § 404.1513a(b)(1).

When a claimant attempts to establish a disability based on his subjective complaints, he or she must provide evidence of an underlying medical condition in either objective medical evidence confirming the severity of the alleged symptoms or that the medical condition reasonably could be expected to give rise to the alleged symptoms.  *See* 20 C.F.R. § 404.1529(a) and (b); *Wilson*, 284 F.3d at 1225-26.

Furthermore, pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an

opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson*, 284 F.3d at 1225.  *See* 20 C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 20 C.F.R. § 404.1545(e) (regarding RFC, total limiting effects).  This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.

To analyze a claimant's subjective complaints, the ALJ considers the entire record, including the medical records; third-party and Plaintiff's statements; the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; the type and dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; treatment, other than medication, received for pain or other symptoms; and other factors concerning functional limitations and restrictions.  20 C.F.R § 404.1529(c)(1), (3)(i-vii).  The Eleventh Circuit has

stated: "credibility determinations are the province of the ALJ."  *Moore*, 405 F.3d at 1212 ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.").

The credibility of the claimant's testimony must be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988)  If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.  *See Wilson v. Barnhart*, 284 F.3d at 1225.  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *Id*.  On the other hand, "[a] clearly articulated finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).

## IV.  Legal Analysis

**The ALJ erred when denying Plaintiff's applications for DIB and SSI benefits.**

1.

Plaintiff suffers from "migraine headaches" which were determined to be a severe impairment.  Tr. 13.  Plaintiff argues the Commissioner's decision should be reversed because the ALJ's RFC determination, Tr. 18,

is not supported by substantial evidence because the ALJ "failed to discuss this undisputed severe impairment and how it could be expected to affect the claimant's ability to perform 'sustained work activities.'"  ECF No. 14 at 3.

Plaintiff further argues "the ALJ improperly failed to credit the subjective testimony of Ms. Dawson" and, "[i]n doing so, the ALJ failed to follow Social Security Ruling 16-3P regarding the assessment of a claimant's subjective testimony, and the ALJ ignored the well-settled law of this jurisdiction."  *Id*.

In sum, Plaintiff argues that the ALJ's RFC "does not account in any way for Ms. Dawson's chronic migraines and the absenteeism and 'off task' behavior this disorder likely would cause.  The ALJ's failure to account for Ms. Dawson's migraine headaches in her RFC makes that RFC defective."  *Id*. at 7 (footnote omitted).

### 2.

The ALJ considered whether Plaintiff has an impairment or combination of impairments that medically equals the severity of one of the listed impairments under the "Medical Listings."  Tr. 14.  The ALJ considered, in part, whether Plaintiff's "migraine headaches" should be considered under a listing and noted:

Though there is no listing pertaining to migraine headaches, the undersigned has considered this condition in conjunction with the requirements of the subsections of section 11.00 of the Medical Listings pertaining to neurological disorders.  In particular, the undersigned has considered subsection pertaining to seizure disorders.  However, the claimant's impairments are not characterized by generalized tonic-clonic seizures that occur at least once a month for at least three consecutive months despite adherence to prescribed treatment; or dyscognitive seizures occurring at least once a week for a least three consecutive months despite adherence to treatment. Furthermore, there is no evidence of generalized tonic-clonic seizures occurring at least once every two months for at least four consecutive months despite adherence to prescribed treatment, with a marked limitation in the following: physical functioning; understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting and managing oneself.  Finally, there is no evidence of dyscognitive seizures occurring at least once every two weeks for at least three consecutive months, despite adherence to prescribed treatment, and a marked limitation in the criteria listed above.

Tr. 15-16.  Plaintiff claims in a footnote that the ALJ's analysis

"was inadequate under SSR 19-4p, and should be reversed for

that reason" and for the reasons set forth in Plaintiff's Brief.

ECF No. 14 at 6 n.2.

Plaintiff provides no other reference to SSR 19-4p nor refers

the Court to any specific Medical Listing that applies in this case

nor provides argument supporting her view that the ALJ's analysis

of the applicability of subsections of section 11.00 pertaining to

neurological disorders was inappropriate.  ECF No. 14.  Therefore, this argument is rejected.

3.

Plaintiff relies heavily on her testimony, based on questions by the ALJ and her attorney, that she suffers from migraine headaches six or seven days per month, that are not helped or treated with medication, and cause blurry vision, white lights, sites of service, noise sensitivity, and olfactory changes.  *See generally* ECF No. 14 at 8-12 (citing Tr. 65-67, 73-74).

Plaintiff also relies on medical record notations including that in September 2019, prior to the relevant disability period in this case and approximately two months before Botox treatments began, Plaintiff was experiencing about 16 migraine days per month.  ECF No. 14 at 12-13 (citing Tr. 497).  Then, after starting Botox therapy and presumably shortly after the beginning of the relevant period in November 2019, Plaintiff notes "the records indicate a greater than 50% reduction in the days per month she experiences a migraine."  ECF No. 14 at 13.  Plaintiff also notes that the same records from Sacred Heart Medical Group confirm "that her treatments were significantly effective for the first two

months of the three months between treatments," but "then she

suffered for the month until her next treatment," which she states is

consistent with her testimony.  ECF No. 14 at 12-13 (citing Tr. 73-

74, 480, 484, 492).  "At the time of her hearing, she had stopped

Botox treatments for that very reason."  ECF No. 14 at 13 (citing

Tr. 73-74).

Plaintiff argues that "[t]he RFC outlined by the ALJ in this

case does not appear to address any of the symptoms

experienced by" Plaintiff.  ECF No. 14 at 13-14.  Plaintiff further

argues that the ALJ's "decision in this case contains neither a

discussion of the frequency of the claimant's headaches nor any

limitations in functioning."  ECF No. 14 at 14.

As part of the RFC factual recitation, the ALJ discussed

Plaintiff's hearing testimony.

> The claimant reports that she is unable to work due to
> musculoskeletal pain, *migraine headaches*,
> and symptomology associated with hypertension.  In
> addition to these physical impairments, the
> claimant reports mental health issues associated with
> a bipolar disorder, an anxiety-related disorder, and
> attention deficit disorder.  (Hearing Testimony; Exhibit
> B2E; B3E; B4E).  The claimant testified that she
> experiences severe back pain and has received
> multiple injections in her neck and shoulder in an
> attempt to manage this pain.  She also reported pain in
> her right foot caused by a fracture that occurred in

2018.  The claimant testified that she takes medications to manage this musculoskeletal pain and medications to manage neuropathy.  *She also reported frequent migraine headaches, and states that she routinely experiences periods of dizziness and syncope* [Tr. 69-72]*.*  In addition to her physical symptomology, the claimant testified that she has significant problems with anxiety and depression, as well as ongoing issues with focus and concentration. The claimant testified that the combined effect of these impairments has significantly impacted her ability to perform her activities of daily living.  (Hearing Testimony).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause only some of her alleged symptoms. Moreover, the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms are not especially consistent with the medical evidence and other evidence in the record (nor are they very persuasive) for the reasons explained below.

Tr. 19 (emphasis added).

Immediately thereafter, the ALJ begins a detailed discussion of the medical records noting that "[t]he records document a history of treatment for musculoskeletal pain, mental health issues, hypertension, *migraine headaches, and syncopal episodes* (Exhibit B2F; B5F; B6F; B10F; B13F), and this treatment has continued into the relevant period," when she "presented to her primary care provider in December 2019, a few weeks after the

amended alleged onset date, reporting persistent *syncopal*

*episode*.  Despite multiple diagnostic tests, the reason for these

episodes was still undetermined.  Objective examination at that

time revealed no focus neurological deficits, and musculoskeletal

examination revealed normal joints and muscles. (Exhibit B6F)."

Tr. 19 (emphasis added).

Plaintiff continued to report pain in her foot and worsening

knee pain in January 2020.  Tr. 19.  Pain continued in February,

"but examination findings were largely normal at that time.  These

records also report ongoing issues *with balance*, and she stated

that her latest fall occurred three weeks prior to this appointment

(Exhibit B6F).  The claimant was receiving treatment for *migraine*

*headaches* during this period as well, and her neurologist was

performing routine Botox injections to help manage this

symptomology.  The claimant reported significant improvement in

her *migraine headaches* with this treatment regimen.  (Exhibit B5F;

B6F)."  Tr. 19-20 (emphasis added).  Primary care records are

discussed from March but unrelated to the *migraine headaches*.

Tr. 20.

Plaintiff "reported a fall during a primary care appointment in May 2020 which resulted in injuries to her neck, left arm, back, and tail bone area, though the claimant did not feel as though she had broken any bones.  The treatment provider noted that the claimant had full range of motion and did not believe x-rays were necessary.  While the claimant reported daily episodes of *dizziness* at this time, she stated her last episode of *syncope* occurred [sic] months before."  Tr. 20 (emphasis added).  "Neurological records from May also note significant improvement in the claimant's *migraine headaches* with Botox injections. (Exhibit B5F)."  *Id*. (emphasis added).

"The claimant reported to the emergency department in June 2020 reporting worsening episodes of *syncope*, which resulted in injury to the right foot."  Tr. 20.  "The claimant was diagnosed with *syncopal vertigo* and a right foot sprain and received medication and a splint for treatment of her symptomology.  (Exhibit B4F)." Tr. 20 (emphasis added).  Plaintiff requested a referral for further evaluation.  *Id*.

Plaintiff "presented for evaluation of her *syncopal episodes* in June 2020, which she stated occurred a few times a week and

were associated with lightheadedness, diaphoresis, and tingling to the face.  Though the claimant was described as chronically ill and ambulated with a walker, the rest of her physical examination was largely normal at that time.  (Exhibit B23F)."  Tr. 20 (emphasis added).  "Orthopedic records from June 2020 noted ongoing tenderness and swelling in the mid-foot… The claimant also sought treatment from pain management in June, rating her musculoskeletal pain as 9 out of 10 on the pain scale."  Tr. 20.  "During an appointment with another provider in July, the claimant reported she was trying to obtain a wheelchair due to mobility issues and *syncopal episodes*.  However, the claimant rated improvement in her *headaches* with medication.  While the claimant continued to use a walker to ambulate, the other physical examination findings were largely normal. (Exhibit B6F)."  Tr. 21 (emphasis added).

> The claimant continued to report improvement in her *migraine headaches with Botox injections, stating in August 2020 that she had a greater than 50 percent reduction in migraine headaches per month since starting this course of treatment*. (Exhibit B5F).  Pain management records from August note continued pain in the lumbar spine, though the claimant reported that trigger point injections had provided a brief 40 percent reduction in pain and that her current treatment and medication regimen allowed

for an increased ability to perform her activities of daily living.  The claimant was continued on conservative treatment measures, and the treatment provider wanted to proceed with medial branch blocks of the lumbar spine and a coccygeal nerve block.  Continued pain in the back and knees was noted during a pain management appointment in September 2020, with pain in the lumbar spine, SI tenderness, and ambulation with a rollator noted upon objective examination. (Exhibit B8F).  *The claimant also presented for further evaluation of her syncopal episodes in September, which she stated occurred a few times a week and could last up to 10 minutes with loss of consciousness*.  Though the claimant continued to use a rollator to ambulate, she was alert and oriented upon examination with no significant deficits noted in any area.  The treatment provider noted that the claimant's symptoms were most consistent with orthostasis or blood pressure abnormality, with polypharmacy likely a large contributor.  A loop recorder was placed for further evaluation. (Exhibit B4F).

Though the claimant reported another fall during a primary care appointment in November 2020, she had experienced *no syncope since the implantation of the loop recorder*.  The claimant did report increased back pain associated with her fall, and stated that *one of her newly prescribed medications made her headaches worse*. (Exhibit B6F).

Tr. 21 (emphasis added).  Back, foot, and knee pain and pain

management were also reported.  *Id*.  "Neurological records from

this [December 2020] again note a greater than 50 percent

reduction in *migraine headaches* with Botox injections."  Tr. 22

(emphases added).

In January 2021, Plaintiff "reported pain in her right great toe" and underwent right 1st and 2nd tarsometatarsal joint arthrodesis and removal of hardware the right foot on January 14, 2021. *Id*. "Pain management records following this surgery indicate that the claimant deferred any injection treatment following this surgery, though she was scheduled for a diagnostic medial branch block in the lumbar spine." *Id*. (citations omitted).

In March 2021, Plaintiff presented to another post-operative orthopedics appointment "and she remained non-weightbearing in a short leg cast. However, she reported no pain or discomfort, and had no complaints at that time." *Id*. Pain in her back and left shoulder were reported but "she was happy with her current treatment plan, which she stated allowed her to complete her activities of daily living more easily." *Id*. "Pain and positive facet loading were noted in the lumbar spine upon examination, and tenderness to palpation and painful range of motion were noted in the claimant's shoulder and knee." *Id*. (citation omitted). Facet joint injections in the lumbar spine were made "and records from May 2021 noted an 80 percent initial improvement with this procedure." Tr. 22.

In June 2021, Plaintiff "reported no improvements with a lumbar facet medial branch block" and reported continued use of a walker for ambulation and reported pain in her left shoulder back and "stated her current medication regimen was allowing her to perform her activities of daily living more successfully.  Pain and positive facet loading were noted in the lumbar spine, and tenderness to palpation and pain with range of motion was noted in the shoulder [and] knee."  Tr. 22-23.

Trigger point injections were received later in June 2021 "and an injection in her left shoulder in early July."  Tr. 23.  Some decrease in pain was noted after a left shoulder injection.  Physical therapy was scheduled.  "*No new syncopal episodes* had occurred since her last visit with this provider, and there were no events documented on the claimant's loop recorder.  (Exhibit B23F)."  *Id.* at 23 (emphasis added).

In August and October 2021, treatment regimens for Plaintiff's pain related to her knee, back, neck, and lumbar spine were noted.  *Id.*

> The claimant presented for a consultative examination in October 2021 [by J. Lance Reese, M.D.], reporting continued problems with chronic back pain and *chronic migraines*.  However, she reported significant abilities

when asked about her functional capacity.  During the evaluation, the claimant's blood pressure was elevated.  However, her posture and gait were normal, with no evidence of ataxia, antalgia, circumduction, lurching, or unsteadiness.  She was able to get on and off the table normally without assistance, and her stamina seemed normal with no obvious signs of dyspnea or fatigue.  The claimant used a rollator to ambulate but was able to ambulate across the room without this assistive device.  She was able to walk on heels, toes, tandem walk, and squat, and was able to bend at the waist.  She had a normal straight leg raise both sitting and supine, and had no deformity, inflammation, stiffness, or abnormal motion during the musculoskeletal examination.  The claimant had normal muscle stretch and tone with no atrophy, and her strength was 5/5 throughout.  Reflexes, sensation, and range of motion were largely normal as well. *Overall, there was no evidence of physical or mental limitation noted on the examination, and the examiner noted she had an embellished examination with very poor effort.  She appeared to be exaggerating symptoms as much more limited on the formal examination than informal observation.  Though she pushed a rollator, she stated this was only in case she faints, and she ambulated easily without it with no evidence of vertigo or weakness upon examination.* (Exhibit B15F) [Tr. 1042].  Imaging of the cervical spine was performed in early October 2021, noting mild to moderate cervical spondylosis.  Imaging of the right knee noted only a trace of degenerative changes (Exhibit B10F).

Tr. 23-24 (emphasis added).  Later in the decision, the ALJ refers

to Dr. Reese's Report and the ALJ's conclusion that Dr. Reese's

evaluation was persuasive overall.  *See infra* at 40-41 for

additional references to Dr. Reese's report.

Case No.  3:23cv7897-CAS

> Indeed, during the consultative examination in October 2021, the claimant was able to get on and off the table normally without assistance and ambulated across the room without the use of her assistive device.  She could tandem walk, squat, and bend at the waist as well, and the examiner noted no evidence of physical limitations in the examination.  (Exhibit B15F) [Tr. 1036-40].

Tr. 25.

During the hearing before the ALJ, Plaintiff denied telling Dr. Reese that she could climb two flights of stairs without getting short of breath; that she could stand for two hours straight without taking a break; and that she could stand eight hours a day if given breaks.  *Compare* Tr. 74-75 *with* Tr. 1036.  Plaintiff also stated that Dr. Reese did not do a "physical exam on [her] at all"; and that she spent "about 30 minutes if that" with Dr. Reese, including the time waiting to get started; and that he spent "[p]robably about 15 minutes" with her.  Tr. 75.

In November 2021, Plaintiff "reported persistent pain during a pain management appointment," "but stated that rest, pain medication, and ibuprofen alleviated some of her pain and allowed her to perform her activities of daily living."  Tr. 24.  She reported "persistent pain that was 9 out of 10 on the pain scale."  *Id*.

Pain is reported during an appointment in December 2021.  "Though the claimant reported *ongoing syncopal episodes* in

December 2021, testing continued to be negative for all etiologies, and the treatment provider again indicated that the claimant's symptomology was likely orthostatic in nature.  It was recommended that the claimant stay hydrated, use compression stockings, and avoid behaviors such as standing up to quickly or prolonged standing. (Exhibit B23F)."  Tr. 24. (emphasis added).

In January 2022, Plaintiff reported a recent fall and ongoing leg pain during a primary care appointment "as well as *daily migraine headaches* despite attempted medication management. However, physical examination findings were largely normal, with no focal neurological defects and normal joints and muscles."  *Id*. (emphasis added).

During an appointment in February 2022, worsening back pain and intermittent knee and right foot pain "as well as worsening back pain that radiated to her extremities" were reported.  *Id*.  "Ongoing dizziness and a recent episode of syncope reported as well, and the claimant requested a referral to neurology.  However, she stated she had not had a headache since starting her new medication, and physical examination

findings were again largely normal.  (Exhibit B21A)."  Tr. 24.

Plaintiff continued to use a rollator.  *Id*.

Plaintiff fell in February 2022 and injured her left knee and after physical examination, mild edema to the lateral side of left knee with moderate tenderness to palpation to the medial tibial plateau were noted.  Plaintiff "had full range of motion without effusion, and the rest of the physical examination findings were normal.  (Exhibit B21F)."  *Id*.

In March 2022, during pain management, increased pain following the fall is noted.  Tr. 24-25.  Additional reports in March note that her knee was still swollen despite trigger point injections although, by April 2022, her left knee pain had improved.  She continued to report pain in her right knee but declined physical therapy.  "She continued to report *episodes of dizziness and syncope* and was scheduled for treatment with neurology."  Tr. 25 (emphasis added).

Plaintiff presented to the emergency department in June 2022 "with left shoulder and neck pain that began after a *syncopal episode* the previous day.  Upon physical examination, cervical

pain and left lateral tenderness was noted, and range of motion was painful but full." Tr. 25 (emphasis added).

> *A CT scan of the cervical spine revealed no acute fracture or focal malalignment, with only mild degenerative disc disease noted. An x-ray of the shoulder also revealed no acute fracture. No acute findings were noted on imaging of the chest, and an ECG revealed normal sinus rhythm.* (Exhibit B26F).

Tr. 25 (emphasis in original).[10]

Thereafter, the ALJ draws several conclusions from the foregoing medical records.

> The foregoing records note ongoing treatment with pain management for musculoskeletal pain throughout the claimant's body. However, the claimant frequently notes improvement in her symptomology with her prescribed treatment regimen, which she states provides an increased ability to perform her activities of daily living. (Exhibit B8F; B12F; B20F).[11] *Indeed, the claimant reports the ability to perform a range of daily activities despite her reported symptomology, stating that she still shops, cleans her residence, and does laundry and other household chores.* (Hearing Testimony; Exhibit B4E) [*see infra* at 36-37].

---

[10]  At this point, the ALJ discusses Plaintiff's weight, which is in the obesity range in relation to SSR 19-2p.

[11]  For example, on January 22, 2021, Plaintiff appeared at the Dynamic Pain & Wellness clinic "for routine followup for history of chronic pain." Tr. 769. In part, a physical examination noted under "[g]eneral." "The patient is welldeveloped and well-nourished and overweight. Patient is alert and oriented. She is in no acute distress. Patient has good hygiene." Tr. 771. It is also stated under "neurological": "The patient is oriented to time, place and person. Gait: Antalgic. Ambulates with rollator[.] She has normal sensation. Motor examination reveals no abnormalities." *Id.* On March 1, 2022, Plaintiff rated "her pain as a 10/10." Tr. 1097. But, Plaintiff was "alert and oriented" and "in no acute distress." Tr. 1099. She was "oriented to time, place and person." *Id.*

Furthermore, while pain management records note pain and tenderness during the objective examinations (Exhibit B8F; B12F; B20F) and the claimant ambulates with a rollator, other treatment records note a steady gait, normal joints and muscles, a full range of motion throughout the claimant's extremities, normal strength, and intact sensation.  (Exhibit B6F; B7F; B8F; B11F; B13F; B15F; B17F; B23F).  Indeed, during the consultative examination in October 2021, the claimant was able to get on and off the table normally without assistance and ambulated across the room without the use of her assistive device.  She could tandem walk, squat, and bend at the waist as well, and the examiner noted no evidence of physical limitations in the examination. (Exhibit B15F).  *While the claimant received treatment for migraine headaches during the relevant period, she noted significant improvement in these migraine[ ] with Botox injections and with the recent prescription of a new medication.  (Exhibit B5F; B6F; B21F).  The claimant also reported episodes of dizziness and syncope, but no explanation for these episodes was found despite attempts at testing, and no events were documented on a loop recorder that was placed for evaluation of these episodes.  (Exhibit B23F).  No focal neurological deficits were noted upon examinations throughout the relevant period.  (Exhibit B4F; B6F; B21F).*

The foregoing evidence supports the determination that the claimant can perform a range of light work.  To address the claimant's reported symptomology, she is limited to sitting for 1 hour at a time but is capable of sitting for up to 6 hours in a workday.  Similarly, while the claimant should stand or walk no more than 30 to 45 minutes at a time, she can stand and walk for up to 4 to 4.5 hours per standard workday.  The claimant must avoid all crawling or climbing up and down ladders, ropes, or scaffolds, and must avoid all exposure to unprotected heights, dangerous moving machinery, excessive vibration when using the hands,

> and the operation of any motorized machinery.
> However, she can occasionally bend, stoop, kneel,
> crouch, and squat, and can occasionally use stairs and
> ramps.

Tr. 25-26 (emphasis added).

Thereafter, the ALJ noted Plaintiff's "continued treatment for her mental health impairments into the relevant period through outpatient medication management" in February, May, and December 2020, January, May, August, and October 2021, and February and April 2022.  Tr. 26-27.  The ALJ summarizes these treatment records.

> The treatment records outlined above note consistent
> medication management for mental health
> symptomology.  While the claimant reports issues with
> focus and attention during the relevant period, she
> frequently notes that her medication regimen helped
> her maintain a stable mood.  Furthermore, her mental
> status examinations are routinely largely normal. She
> is described as calm, pleasant, cooperative, and
> engaged, and her thought processes are organized,
> linear, and goal directed.  Her memory is routinely
> intact, with adequate judgment noted throughout the
> records.  Furthermore, no significant deficits are noted
> in her focus, and she is described on multiple
> occasions as having appropriate attention and
> concentration.  (Exhibit B10F; B14F; B15F; B19F;
> B25F).  By the time of the consultative examination in
> October 2021, the claimant denied any work impact
> from her mental health symptomology.  Exhibit B15F).
> *Indeed, the claimant has reported the ability to perform*
> *significant activities of daily living throughout the*

> *relevant period, including shopping, completing household chores, managing her finances, and attending school.* (Hearing Testimony; Exhibit B4E; B10F; B14F; B19F) [*see infra* at 36-37]. The foregoing evidence supports the determination that the claimant would be capable of performing routine, repetitive, unskilled work tasks of a lower stress nature, such as those requiring no more than occasional changes in the routine unskilled work setting, no more than occasional decision making on the job, and no more than occasional interaction with supervisors or members of the general-public.

Tr. 27-28 (emphasis added).

### 4.

During the hearing, in response to the ALJ's question, Plaintiff testified she has not done any work of any kind since her amended onset date of November 23, 2019. Tr. 64. Plaintiff briefly testified that on days when she is "not feeling [her] worse," she does "a little housecleaning and laundry," but is not able to drive so someone goes with her to the grocery. Tr. 76. She last drove "probably in 2019" and does not drive by choice for fear of fainting. Tr. 76-77. She is "not able to exercise because it hurts—it hurts [her] back and it hurts [her] foot too bad." She has been seeing a neurologist (for the loop recorder) at Sacred Heart Medical Group, *see* Tr. 1370-1405, but the doctors "haven't told [her] anything…they don't know what's wrong." Tr. 78-79. The

ALJ responded "[t]hat isn't helpful" and followed up with: "You're an enigma." Tr. 79.

Plaintiff's responses in the January 14, 2021, Function Report (Exhibit B4E) support her testimony that she does little daily activities, if any. Tr. 337-44. Plaintiff indicated she had no problem with personal care but did not prepare her own meals; did not do house or yard work; only goes outside for doctor appointments; does not drive because of syncope episodes, migraines, and hallucinations; shops by computer; pays her bills; does not spend time with others; has no hobbies; and has problems getting along with others. Tr. 338-44 (Exhibit B4E).

5.

After summarizing the medical records, the ALJ considered the opinions of the state agency medical consultants upon initial review and upon reconsideration. Tr. 28-29.

> As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

The undersigned finds the opinion of the state agency medical consultant upon initial review [May 6, 2021, Tr. 120-71] to be partially persuasive. In this determination, the state agency opined that the claimant could perform a range of light work, if limited to only frequent climbing of ramps and stairs and if the claimant avoided concentrated exposure to hazards. (Exhibit B3A; B4A). As outlined in detail above, the determination that the claimant is capable of lifting the 20 pounds occasionally and 10 pounds frequently required for work at a light exertional level is consistent with the overall evidence, which notes improvement in the claimant's symptomology with treatment (Exhibit B8F; B12F; B20F), full strength during multiple objective examinations throughout the relevant period (Exhibit B6F; B7F; B8F; B11F; B13F; B15F; B17F; B23F), *and the ability to perform significant activities of daily living like shopping and performing household chores*. (Hearing Testimony; Exhibit B4E) [*see supra* at 36-37]. However, the state agency was unable to support their findings with the most updated evidence of record, which documents ongoing symptomology that would require more restrictive limitations than contemplated by the state agency. Therefore, the undersigned only finds this opinion to be partially persuasive.

The undersigned finds the opinion of the state agency upon reconsideration [Oct. 14, 2021, Tr. 174-97] to be more persuasive than the assessment upon initial review, though this opinion is still found to be only partially persuasive. In this determination, the state agency again found the claimant to be capable of performing a range of light work, but limited the claimant to frequent balancing, kneeling, and crouching, and stated the claimant could never climb ladders, ropes, or scaffolds. Furthermore, the state agency opined upon reconsideration that the claimant should avoid concentrated exposure to extreme heat, extreme cold, humidity, pulmonary irritants, and

hazards.  (Exhibit B9A; B10F).  As stated above in detail, the determination that the claimant would be capable of performing the lifting and carrying requirements of light work is consistent with the overall evidence, and the state agency was able to support this opinion with more updated records.  However, this opinion is still not supported with the most updated evidence, now available to the undersigned at the hearing level.  While the determination that the claimant would not be capable of climbing ladders, ropes, or scaffolds or exposure to hazards is consistent with the claimant's ongoing symptomology, there is no support in the record for the pulmonary or temperature limitations outlined by the state agency. The claimant's symptomology would also require more limitations on standing, walking, and postural limitations than contemplated by the state agency. Therefore, while this opinion is more persuasive than the opinion rendered at the initial state agency level, the undersigned can only find it to be partially persuasive.

Tr. 28-29 (emphasis added).[12]

The findings of a State agency medical consultant may provide additional evidence to support the ALJ's findings.  *See Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).  *See also Kemp v. Astrue*, 308 F. App'x 423, 427 (11th Cir. 2009) (unpublished) ("the weight to be given [to] a non-examining

---

[12]  The ALJ also considered the opinions of the state agency psychological consultants and concluded: "Therefore, the determination that the claimant has no more than moderate limitations in any area of mental functioning and would therefore be capable of performing a range of unskilled work is consistent with the overall evidence of record, and the undersigned therefore finds this opinion to be persuasive."  Tr. 29.

physician's opinion, depends, among other things, on the extent

on which it is supported by clinical findings and is consistent with

other evidence.").

6.

Later in the decision, the ALJ concluded that Dr. Reese's

evaluation of the claimant in October 2021, was "persuasive

overall" and stated:

> Dr. Reese opined that the claimant's multiple medical
> conditions did not cause a specific work impact, and
> there was no evidence of a physical or mental
> limitation noted on his examination.  He specifically
> stated that the claimant embellished her symptomology
> on examination and *gave a very poor effort*.  His
> opinion is supported by the many normal findings
> noted upon his examination, including the claimant's
> ability to ambulate without her assistive device, her full
> strength, and her ability to tandem walk, squat, walk on
> heels, walk on toes, and bend at the waist.  (Exhibit
> B15F) [Tr. 1034-42].  While the determination that the
> claimant would have no limitations is not consistent
> with the ongoing symptomology noted in the treatment
> records, the determination that the claimant would not
> have disabling symptomology is consistent with the
> claimant's reported improvement with treatment
> (Exhibit B8F; B12F; B20F) and the normal findings on
> many objective examinations throughout the record.
> (Exhibit B6F; B7F; B8F; B11F; B13F; B14F; B23F).  As
> this opinion is supported by Dr. Reese's objective
> examination and is generally consistent with many of

the treatment records, the undersigned finds it to be persuasive overall. [13]

Tr. 29 (emphasis in original); *see supra* at 30 for Plaintiff's

responses to the ALJ's questions regarding several of Dr. Reese's

findings.

### 7.

The ALJ considered the opinions of Kaylee Gordon, APRN

(Advanced Practice Registered Nurse); Holly Malone, APRN;

Rhonda McPherson, APRN; and Jason R. Foremen, DO, several

of Plaintiffs examination and treatment providers.[14]  Tr. 30.

> Kaleigh Gordon, [APRN], one of the claimant's
> treatment providers, opined that the claimant was
> deemed unable to 'work' at all.  (Exhibit B6F) [Tr. 631,
> Dec. 12, 2019].  Any opinion regarding the claimant's
> ability to perform work full-time in a competitive market
> is an opinion reserved to the Commissioner, and the
> undersigned therefore cannot find this opinion to be

---

[13]  Dr. Reese is not a treating physician; so his opinion was not entitled to deference or special consideration.  *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (explaining that one-time medical examiners are not "treating physicians" and, thus, "their opinions are not entitled to deference") (citation omitted).

[14]  For claims filed before March 27, 2017, the opinions of APRN's Ms. Gordon, Ms. Malone, and Ms. McPherson would not have been from an acceptable medical source such as a licensed physician or licensed or certified psychologist or the like. *See Osterhoudt v. Astrue,* Case No. 8:10-CV-336-T-TGW, 2011 U.S. Dist. LEXIS 5781, at *7 (M.D. Fla. Jan. 14, 2011); 20 C.F.R. § 404.1513(a)(1)-(2) (as amended).  For claims filed after March 27, 2017, as here, it would appear that advanced practice registered nurses are considered medical sources and their opinions would be considered in light of 20 C.F.R. § 404.1520c(a) as discussed herein.  *See supra* at 12-14.

Case No.  3:23cv7897-CAS

persuasive.  Similarly, the undersigned does not find the opinion of Holly Malone, [APRN], to be persuasive. She also opined that the claimant was unable to 'work' at all, stating the claimant cannot work while sitting down or standing up.  She opined that the claimant ambulates with a walker and cannot do volunteer hours or go to classes.  (Exhibit B16F) [Tr. 1045, Jan. 21, 2022].  This opinion is not only largely reserved to the Commissioner [*see supra* at 11, n.9], it is also very inconsistent with this provider's own statements that the claimant is not required to attend physical therapy, counseling, or any other type of regular appointments [Tr. 1045].  *Furthermore, it is wholly inconsistent with the overall evidence, which notes that the claimant did, in fact, attend nursing courses during the relevant period* (Exhibit B10F; B14F; B19F) [*see infra at 43-44*], *and performed other significant activities of daily living during the relevant period*.  (Hearing Testimony; Exhibit 4E) [*but see supra* at 36-37].  Therefore, the undersigned cannot find this opinion to be persuasive. Another treatment provider, Rhonda McPherson, [APRN], opined that the claimant's pain disability index was in the moderate to severe range in her treatment records (Exhibit B20F) [*see, e.g.,* Tr. 1127, Dec. 29, 2021], but did not define 'moderate' or 'severe' in her opinion or place any functional limitations on the claimant.  Therefore, the undersigned cannot find her opinions to be persuasive.

Tr. 30 (emphasis added).

The three nurses consistently confirm Plaintiff's reported impairments like Plaintiff's other examining and treating medical sources.  However, in the same patient notes, e.g., Nurse Gordon, consistent with Nurses Malone, McPherson, and others, noted in a December 12, 2019, report: "no focal deficits" under "neuro";

"[n]ormal mood with appropriate affect" and "intact judgment and insight" and A&OX3 with a cordial affect" under "psych".  Tr. 635; *see also* Tr. 616 (Feb. 14, 2020); Tr. 696 (July 5, 2019); Tr. 685 (July 15, 2019); Tr. 720 (May 2, 2019); Tr. 1216 (July 7, 2021); Tr. 1189-90 (Aug. 12, 2021); Tr. 1099 (Oct. 7, 2021); Tr. 1124 (Dec. 29, 2021); Tr. 1314 (Jan. 21, 2022).  These latter observations are consistent in this record.

Exhibits B10F, B14F, and B19F referred to above, *see, e.g.*, *supra* at 36-37 and 42-43, are from Lakeview Center and span from September 14, 2018, through December 9, 2022.  They appear to deal mainly with Plaintiff's psychological issues although they refer to physical and mental problems.  They consistently set forth Plaintiff's medical history and impairments, but also include related observations.  For example, and relevant here, a note from May 4, 2021, states that Plaintiff "is not currently working, and is not in school."  Tr. 1027; *see also* Tr. 883 (July 30, 2019 (same); Tr. 913 (Jan. 28, 2021 (same)).  Another note from December 9, 2022, states that the "[p]lan will be to reinstate Adderall XR as the patient describes *difficulties at work and in completing her schoolwork*."  Tr. 1079 (emphasis added).  (There is no mention in this note where Plaintiff is

working or the nature of her schoolwork.)  *See also* Tr. 1450-51 (Apr. 27, 2022, mentions Plaintiff as a "nursing assistant").

Balanced with detailed notes regarding Plaintiff's impairments, it is stated consistently throughout these notes that Plaintiff was alert and oriented in person, place, time, and situation; mood appeared euthymic; and Plaintiff displayed a full range of appropriate affect.  There was no evidence of auditory hallucinations, delusions or paranoia, and no loose associations, tangentiality or circumstantiality.  She appeared grossly intact, and insight and judgment appeared to be intact and adequate.  *See also*, Tr. 903, 1028, 1080.

8.

The ALJ considered the treatment notes from Jason R. Foremen, DO, one of the claimant's treatment providers, who opined that the claimant should avoid standing up too quickly or prolonged standing. (Exhibit B23F/6) [Tr. 1375].

> This opinion is also vague, as Dr. Foreman does not define his use of 'prolonged' or relate it to any work-related activity.  *Though his limitations are consistent with the claimant's reports of syncope, his opinion is not consistent with the claimant's reported ability to perform significant activities of daily living* (Hearing Testimony; Exhibit 4E) [*but see supra* at 36-37] and the lack of focal neurological defects on multiple objective examination.  (Exhibit B4F [Tr. 412, 426]; B6F [Tr. 545, 550, 558, 572, 582, 586, 595]; B21F

[Tr. 1314, 1333, 1344, 1357]).  Therefore, the
undersigned cannot find this opinion persuasive to any
significant extent.

Tr. 30 (emphasis added).

The Plaintiff does not expressly challenge the ALJ's decision

regarding the consideration of various medical source opinions,

including the APRNs, Dr. Reese, and Dr. Foreman.

9.

The ALJ concluded the explanation for the RFC

determination as follows.

> Based on the foregoing, the undersigned finds the
> claimant has the above residual functional
> capacity assessment, which is supported by the
> claimant's noted improvement with treatment, the
> many normal findings on objective examinations
> throughout the record, and the claimant's significant
> reported activities of daily living. Indeed, the overall
> evidence supports the determination that the claimant
> could perform a reduced range of light level work, with
> the postural, mental, and environmental limitations
> outlined in Paragraph # 5 to fully address any
> persistent symptomology.  The claimant can sit for 1
> hour at a time, for a total of 6 hours in a workday, and
> stand/walk for 30 to 45 minutes at a time, for a total of
> 4 or 4.5 hours in a workday.  The claimant is also
> mentally capable of performing only routine, repetitive,
> unskilled work tasks of a lower stress nature, such as
> those requiring no more than occasional changes in
> the routine unskilled work setting, no more than
> occasional decision making on the job, and no more
> than occasional interaction with supervisors or
> members of the general public.

Tr. 30.

10.

There is substantial evidence to support the ALJ's

determination that Plaintiff has several severe impairments

including but not limited to migraine headaches and that Plaintiff

has been hampered in her ability to work since her amended onset

date of November 23, 2019.  The treating medical source(s) notes

confirm this conclusion.  The question is whether there is

substantial evidence to support the ALJ's findings and conclusions

that she has the RFC to perform work in the national economy.

Some medical sources confirm that Plaintiff cannot work and is

otherwise disabled.  Others, including the consultant examiner and state

agency sources, conclude that Plaintiff has the RFC to perform work in the

national economy although limited by the ALJ.

It is telling that during the hearing before the ALJ, Plaintiff, in

response to questioning by the ALJ, responded that a neurologist she had

been seeing did not "know what's wrong" with her and that has not been

helpful.  The ALJ characterized Plaintiff as "an enigma."  Tr. 79; *see supra*

at 37.

There is a dichotomy in this case between the Plaintiff's statements made to various medical sources detailing her numerous ailments and severe impairments-including but not limited to migraines and headaches-and the observations made by some of the same medical sources and in the same medical records, that Plaintiff has no neurological deficits.

Pursuant to the new regulatory framework, the ALJ discussed the supportability and consistency of the opinions of the various medical sources who supported and rejected Plaintiff's claim of an inability to function in the workplace.  The ALJ draws conclusions throughout the decision that Plaintiff performs *significant daily activities*, attempting to support his conclusion that Plaintiff is not disabled*.*

Notwithstanding the ALJ's characterizations of Plaintiff's daily activities as significant, Plaintiff's reported daily activities are not significant at all-they are wanting but for a few references to work and schooling which were not corroborated in any significant manner.  *See supra* at 36-37.  The ALJ refers several times to Plaintiff's hearing testimony noting that Plaintiff performs significant daily activities.  However, her testimony and other evidence is to the contrary.  *See supra* at 36-38, 43-44.

An ALJ may consider a claimant's daily activities as a factor when evaluating a claimant's symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(i).

When examining daily activities, an ALJ must consider the record as a

whole.  *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986).

Although not dispositive, the claimant's daily activities may show that her

symptoms are not as limiting as alleged and as reflected in the ALJ's RFC.

*See Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R.

§ 404.1529(c)(3)(i); SSR 16-3p.  *But see Lewis v. Callahan*, 125 F.3d 1436,

1441 (11th Cir. 1997) ("participation in everyday activities of short duration,

such as housework or fishing" does not disqualify a claimant from

disability).  This means, for example, a claimant's participation in everyday

activities of short duration will not prevent a claimant from proving disability.

*Id*.

Plaintiff's severe impairments are supported and consistent with the

record.  The ALJ's characterization of what she does on a daily basis as

"significant" is not based on substantial evidence.[15]  In fact, the evidence is

to the contrary.  Based on a reading of the entire decision, the ALJ relied

on his assessment of Plaintiff's *significant daily work* in reaching, at least in

---

[15]  The undersigned acknowledges that Plaintiff did not raise this specific issue in her brief, although Plaintiff mentions that "the ALJ improperly failed to credit the subjective testimony of" Plaintiff.  *See* ECF No. 14 at 3.  But it cannot be overlooked when reviewing the entire record to determine if substantial evidence supports the ALJ's determination of disability in light of the ALJ's consistent referral throughout the decision to Plaintiff's performance of significant daily activities balanced against her claims of disability.

material part, his conclusion that Plaintiff is not disabled and can perform work in the national economy consistent with the RFC criteria.[16]  (In addition to other favorable findings by the ALJ, the Commissioner suggests that the ALJ "also reasonably considered Plaintiff's activities, such as shopping, cleaning her home, washing clothes, and being able to handle normal household chores…."  ECF No. 15 at 13; *see also id.* at 19.)

The undersigned is ever mindful of the admonition that the Court is not to re-weigh the evidence and our inquiry is limited to whether substantial evidence in the record as a whole can support the ALJ's findings.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir.2011).  To this end, the ALJ's decision, however, is not supported by or consistent with a significant portion of the record pertaining to Plaintiff's daily activities, including but not limited to Plaintiff's testimony, and is not supported by substantial evidence.  The Court will not speculate whether the ALJ would have reached the same result in light of Plaintiff's limited

---

[16] Generally, a failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).  To this end, the ALJ mischaracterized Plaintiff's hearing testimony and supporting relevant portions of the record.  *See generally Maselli v. Astrue,* Case No. 1:07-cv-91-MP/WCS, 2008 U.S. Dist. LEXIS 36164, *19-21 (N.D. Fla. Jan. 30, 2008), *adopted*, 2008 U.S. Dist. LEXIS 15378 (Feb. 28, 2008); *Mathis v. Astrue*, Case No. 3:06-cv-816-J-MCR, 2008 U.S. Dist. LEXIS 24365, *33-34 (M.D. Fla. Mar. 27, 2008).

Case No.  3:23cv7897-CAS

daily activities.  As a result, the ALJ's RFC determination and the jobs identified by the VE based on the RFC are not sustainable.

## V.  Conclusion

Considering the record as a whole, the findings of the ALJ are not based upon substantial evidence in the record.  The decision of the Commissioner to deny Plaintiff's applications for DIB and SSI is **REVERSED** and the matter **REMANDED** for further proceedings not inconsistent with this opinion.  The Clerk shall enter Judgment for Plaintiff.

**DONE IN CHAMBERS** at Tallahassee, Florida, on April 17, 2024.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**